**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MARY DIMICK,

    Petitioner,                                            2:13-cv-00562-RFB-PAL

vs.                                                      **ORDER**

SHERIFF JOSEPH LOMBARDO, *et al.*,

    Respondents.

## I. Introduction

This action is a petition for writ of habeas corpus by Mary Dimick, who was convicted of driving under the influence of a controlled substance. The action is before the Court with respect to the merits of the claims in Dimick's petition. The Court will deny Dimick's petition, and will deny a certificate of appealability.

## II. Procedural History and Factual Background

Dimick was convicted on August 3, 2011, in a Las Vegas Municipal Court of driving under the influence of a controlled substance, and she was sentenced to a fine of $597, "DUI school," and "Victim's Impact Panel." *See* Transcript of Trial, August 3, 2011, Exhibit 2, pp. 123-27 (Unless

1 otherwise noted, the exhibits referenced in this order were filed by respondents and are found in the
2 record at ECF No. 5.).
3   Dimick appealed to Nevada's Eighth Judicial District Court. *See* Appellant's Opening Brief,
4 Exhibit 3; Respondent's Response Brief, Exhibit 4; Appellant's Reply Brief, Exhibit 5. The state
5 district court entertained oral argument on July 12, 2012. *See* Reporter's Transcript, July 12, 2012,
6 Exhibit 6. The state district court affirmed. *See id*. at 23. The court issued a written order on
7 July 13, 2012. *See* Order Denying Appeal, Exhibit 7.
8   Dimick then filed two motions in the state district court requesting that the state district court
9 rehear the case. *See* "Motion for the Court to Address and Decide Mary Dimick's Constitutional
10 Issue," Exhibit 8; Motion for Rehearing, Exhibit 10. On August 27, 2012, the court denied those
11 motions on procedural grounds. *See* Register of Actions, Case No. C-11-275398-A, Exhibit 13.
12 On October 15, 2012, the court issued a written order. *See* Order Dismissing Motion for Rehearing,
13 Exhibit 14.
14   Dimick then filed a petition for writ of mandamus in the Nevada Supreme Court, regarding
15 the state district court's denial of the motion for rehearing. *See* Petition for Writ of Mandamus,
16 Exhibit 15. On February 13, 2013, the Nevada Supreme Court denied the petition for writ of
17 mandamus, ruling that the motion for rehearing was untimely filed. *See* Order Denying Petition,
18 Exhibit 16. Dimick filed a petition for rehearing in the Nevada Supreme Court. *See* "Ms. Dimick's
19 Motion for Rehearing Pursuant to NRAP Rule 40," Exhibit 17. The Nevada Supreme Court denied
20 rehearing on March 28, 2013. *See* Order Denying Rehearing, Exhibit 18.
21   Dimick filed her federal petition for writ of habeas corpus, initiating this action, on April 2,
22 2013. *See* Petition for Writ of Habeas Corpus (ECF No. 1).
23   On July 20, 2012, the Court screened Dimick's habeas petition, pursuant to Rule 4 of the
24 Rules Governing Section 2254 Cases in the United States District Courts, and, noting that it
25
26
27
28

appeared that Dimick might not have been in custody when she filed the petition, ordered Dimick to show cause why the Court should not dismiss the action for lack of jurisdiction. *See* Order entered May 15, 2013 (ECF No. 2). Dimick responded on May 16, 2013 (ECF No. 3). On July 16, 2013, the Court found that Dimick had adequately responded to the order to show cause, ordered her petition served on respondents, and ordered respondents to answer or otherwise respond. *See* Order entered July 16, 2013 (ECF No. 4).

Respondents filed an answer on August 27, 2013 (ECF No. 5), and Dimick filed a reply on October 3, 2013 (ECF No. 6).

On June 30, 2015, the Court dismissed this Dimick's action without prejudice, determining that had not exhausted her claims in state court. *See* Order entered June 30, 2015 (ECF No. 8). Dimick moved for reconsideration of that ruling (ECF Nos. 10, 11), and on March 30, 2016, the Court granted that motion, ruling that, in light of the intervening decision of the Ninth Circuit Court of Appeals in *McMonagle v. Meyer*, 802 F.3d 1093 (9th Cir. 2015) (en banc), Dimick did exhaust her claims in state court. *See* Order entered March 30, 2016 (ECF No. 19). The judgment of the Court entered on June 30, 2015, was, therefore, vacated. *See id*. at 6.

On April 13, 2016, Dimick filed supplemental points and authorities in support of her habeas petition (ECF No. 20).

**III. Discussion**

    **A. Standard of Review**

28 U.S.C. § 2254(d) sets forth the primary standard of review applicable in this case under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing

4

standard as "a difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

When more than one state court has adjudicated the petitioner's claims, the federal habeas court's analysis focuses on the last reasoned decision. *See Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

If the state courts have denied relief on the merits of a claim, but have done so without any discussion of the claim, and without providing any reasoning for the ruling, the AEDPA standard still applies. *See Harrington v. Richter*, 562 U.S. 86, 98-99 (2011). When there is no reasoned state court decision, the federal habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." *Id*. at 98. In such a case, the federal habeas court independently reviews the record, and determines whether the silent state court decision was objectively unreasonable. *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

On the other hand, if the state courts did not rule on the merits of a habeas claim -- for example, if the claim was rejected in state court for procedural reasons not amounting to a procedural default of the claim in federal court -- "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'" *Cone v. Bell*, 556 U.S. 449, 472 (2009) (quoting 28 U.S.C. § 2254(d)). In such a case, the federal habeas court reviews the claim *de novo*. *Id*. at 472; *Scott v. Ryan*, 686 F.3d 1130, 1133 (9th Cir. 2012).

**B. Dimick's Claim That She Was Convicted Based on Conduct Not Charged in Complaint**

Dimick claims that, in violation of her federal constitutional rights, she was convicted "based

on conduct not charged in the complaint." Petition for Writ of Habeas Corpus (ECF No. 1), p. 1.

Dimick was charged, in a criminal complaint, with driving under the influence of a controlled substance, specifically the prescription drug hydrocodone, which is also known by the brand name, Lortab. *See* Amended Criminal Complaint, Exhibit 1. According to Dimick, however, her conviction was based on the trial court's finding that she drove under the influence of the combination of hydrocodone and Soma, which is also known by the drug's generic name, carisoprodol. *See* Petition for Writ of Habeas Corpus, pp. 3-4, 9-13. Dimick claims that, because she was not charged with driving under the influence of the combination of the two drugs, but only with driving under the influence of hydrocodone, she received inadequate notice of the crime that she was accused of committing. *See id*.

Dimick argues that, on her appeal to the state district court, the court did not rule on this claim, and, therefore, this Court should review the claim *de novo*. *See* Supplemental Points and Authorities in Support of the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 20). The Court disagrees. Dimick raised this claim on her appeal to the state district court. *See* Appellant's Opening Brief, Exhibit 3, pp. 6-10. And, the state district court affirmed Dimick's conviction in all respects. *See* Order Denying Appeal, Exhibit 7 ("[T]he Appellant-Defendant's appeal is denied, the verdict of the Las Vegas Municipal Court is hereby affirmed, and the case remanded to the Las Vegas Municipal Court Department 2 for completion of sentence."). There is no indication, in either the transcript of the state district court hearing on Dimick's appeal (Exhibit 6), or the written order of the state district court (Exhibit 7), that the state court's rejection of this claim was other than on its merits. There is no indication that the state district court's ruling was based on a state-law procedural bar. *See* Reporter's Transcript, July 12, 2012, Exhibit 6; Order Denying Appeal, Exhibit 7.

Because the state court denied relief on the merits of this claim, the deferential AEDPA

standard applies. *See Harrington*, 562 U.S. at 98-99. Because the state courts denied the claim without any discussion and without providing any reasoning for the ruling, the question before this federal habeas court is whether there was any reasonable basis for the state court to deny relief. *See Harrington*, 562 U.S. at 98.

The Sixth Amendment guarantees criminal defendants the right to be informed of the nature of the charges against them so that they may adequately prepare a defense. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation ...."); *see also In re Oliver*, 333 U.S. 257, 273 (1948) (failure to afford petitioner reasonable opportunity to defend himself against charge constitutes denial of due process); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge ... [is] among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."). The Due Process Clause of the Fourteenth Amendment renders this constitutional guarantee applicable to the states. *Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007).

In this case, a reasonable reading of the record is that Dimick was convicted of the crime she was charged with: driving while impaired by hydrocodone.

The amended criminal complaint, in which Dimick was charged, alleged:

> [t]hat the said Defendant did wilfully and unlawfully drive a motor vehicle and/or be in actual physical control of a motor vehicle by having existing or present bodily restraint, directing influence, domination, or regulation of the vehicle on a highway or on premises to which the public has access while under the influence of a controlled substance or chemical substance, to-wit: Hydrocodone, to any degree, however slight, that the Defendant was incapable of safely operating said vehicle.

Amended Criminal Complaint, Exhibit 1.

At the conclusion of Dimick's municipal court bench trial, the trial judge explained her ruling, finding Dimick guilty, as follows:

7

Well, at this time I am going to find the defendant guilty. That is based on a couple of factors. We have two independent witnesses who observed the defendant driving, and on their own called 9-1-1 based on their observations, which were that the defendant stopped at a light, failed to accelerate until she was told to go, then started driving into oncoming traffic, continued driving to the point that she was actually followed by Mr. Baker based on his observations. Then she crashed into traffic barrels and continued to drive. So I think it's pretty clear she was impaired in her driving. She was not operating her car in a safe manner, so I am going to find the impairment and unsafe driving.

Then we have Officer Laythorpe, who has described his experience in detail, who says that he observed a number of things that were consistent with impairment, specifically the slurring, the defendant's walk, and then he performed four -- I'm sorry -- five field sobriety tests or different portions and the defendant performed unsatisfactorily on four of the five. There was noticeable impairment is I think what he said. So I think we have the impairment.

With regard to what was the cause of the impairment, I think the defendant's own admission that she was on Hydrocodone is sufficient to meet that prong. In addition --

\* \* \*

... [W]e have the defendant's admission coupled with the fact that there was Hydrocodone found in her possession as well as the second drug Soma. Granted she's not charged with the Soma, however, the defendant, by her own admission, was on both drugs.

Now, I understand your point that the Hydrocodone alone might not cause her to have the certain clues on certain tests. But the combination of the drugs, according to the officer, would cause these clues to exist. So, she's only charged with the Hydrocodone, however, the combination has created this situation.

So, based on those factors, I am finding the defendant guilty. And I will hear from Mr. Orsinelli [prosecutor] with regard to sentencing.

Trial Transcript, Exhibit 2, pp. 123-25.

It is an objectively reasonable reading of the trial judge's ruling to conclude that the court found Dimick guilty of driving while impaired by Hydrocodone. In its ruling, the court noted that Dimick was in possession of, and under the influence of, Soma, as well, but it is reasonable to construe that as merely an explanation of why the results of certain tests performed on Dimick reflected her use of Soma but not her use of Hydrocodone. The court acknowledged that "the

Hydrocodone alone might not cause her to have the certain clues on certain tests." The court never indicated, however, that Hydrocodone alone would not have been sufficient to impair Dimick's driving or to cause her to fail the sobriety tests, only that certain test indicators might not have been present without the additional presence of the Soma. The court's mention of Dimick's use of Soma did not undermine its ruling that she was proven guilty of driving while impaired by Hydrocodone; whether or not she was also under the influence of Soma, Dimick was found to be under the influence of Hydrocodone. Therefore, because Dimick's conviction can reasonably be construed as based on the conduct charged in the complaint -- driving under the influence of Hydrocodone -- Dimick's claim fails, and the Court will deny her habeas corpus relief with respect to it.

### C. Dimick's Claim That She Was Convicted Based on Insufficient Evidence

Dimick also claims that her federal constitutional rights were violated because the evidence presented at her trial was insufficient to support her conviction of driving while impaired by hydrocodone.

Dimick asserted this claim on her appeal to the state district court. *See* Appellant's Opening Brief, Exhibit 3, pp. 10-23. The state district court denied the claim, ruling that, viewing the evidence in the light most favorable to the prosecution, there was "more than sufficient evidence in the record" to find Dimick guilty. Order Denying Appeal, Exhibit 7, p. 1. This court finds that the state court ruling was reasonable.

As a matter of federal constitutional law, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When reviewing a sufficiency of the evidence claim, a federal habeas court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See*

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A federal habeas court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

Furthermore, beyond the deference that the federal habeas court must afford the trier of fact, the federal habeas court must "apply the standards of [*Jackson*] with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Applying the AEDPA standard, the federal habeas court must ask "whether the decision of the [state appellate court] reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of this case." *Id.* at 1275 & n.13.

Dimick was convicted following a bench trial in a Las Vegas Municipal Court. *See* Trial Transcript, Exhibit 2.

The first witness to testify at Dimick's trial was Debra Ann Faria. *See id.* at 6-15. Faria testified that in the afternoon on February 13, 2009, she saw Dimick driving a black truck on Elkhorn Road, near Caldwallader Middle School, in Las Vegas. *See id.* at 7-9. Faria testified as follows about what she observed:

> Q. And while you were driving in your vehicle, what, if anything, did you observe?
> A. Um, I was at the stoplight; the light was red. And when it turned green, there was a black truck in front of me, and it took a long time for the black truck to proceed across the intersection. She just stayed at the light, didn't go. And so I waited and then I honked. And it must have took, I would say, a good seven seconds before she actually even moved --
>
> Q. And where --
> A. -- once the light changed.
> Q. -- where was this, what was the intersection?
> A. The intersection was Buffalo and Elkhorn.
> Q. And then after she again proceeded what happened?

10

| | | |
|---|---|---|
| 1 | A. | She drove in the opposite lane onto oncoming traffic. |
| 2 | Q. | And were there any other cars in the oncoming traffic lane? |
| 3-4 | A. | Um, yes, there were. Not at first, but there were a little bit farther down. And as they started heading west, they had to swerve out of her way, at least two cars that I can remember. |
| 5 | Q. | And what happened next? |
| 6-9 | A. | Um, she proceeded to drive in the wrong side of the road, the opposite side. And I drove very slow because I was afraid that she was going to come into my lane. I'd -- and, um, pretty close to the intersection Tenaya is right before you got to Tenaya there's an island. So right before the island she stopped completely, and she was on the opposite side of the road. And on Tenaya is where I turn left. So, as I was passing her, I went really slow and I looked at her. And she just had this blank look on her face like she had no idea what was going on. |
| 10 | Q. | And then did you follow her after that? |
| 11-12 | A. | Um, no. I just proceeded to the street, Tenaya, where I turn, because my home is not too far from there. And just a couple house down, as soon as I pulled into my driveway, I got on my cell phone and I called the police. |

*Id*. at 7-8.

The second witness to testify at Dimick's trial was Kurt Baker, who also observed Dimick's driving and also called the police. *See id*. at 15-29. Baker testified as follows:

| | | |
|---|---|---|
| | Q. | And while you were driving on Elkhorn, what, if anything, did you observe? |
| | A. | Ah, pick-up truck driving real bad, swerving left to center. |

\*      \*      \*

| | | |
|---|---|---|
| | Q. | Do you recall the color of the pick-up? |
| | A. | It was either dark blue or black. |

\*      \*      \*

| | | |
|---|---|---|
| | Q. | You said that when you first noticed the vehicle it was driving -- I don't remember your exact terminology -- how was it driving? |
| | A. | Just real bad. |

\*      \*      \*

11

1  Q. Can you describe for the Court what do you mean by real bad?

2  A. Just going left of center. I mean, clear over to the lefthand sidewalk and then back.

3

4  Q. And how many times did it go over to the other sidewalk; do you ... recall?

5  A. I think just one time. But then it was just going left to center, and I would have to say three or four times easy.

6

7  Q. And did -- were there other vehicles in the other lane?

8  A. Ah, yeah. Couple of them had to slow down and stop, I do believe.

\*    \*    \*

9

10  Q. When you say that you believe, do you remember if cars had to --

11  A. I'm --

12  Q. -- slow down or stop or --

13  A. -- I'm fairly sure that -- yeah. Because she was driving in their lane and -- yes, they had to stop to avoid her.

14  Q. And so then as you were following the vehicle, what else did you observe?

15

16  A. Um, we just -- I just followed her, too, and she did a U-turn on Elkhorn at Decatur at DMV and started going back west. She ran over a couple construction barrels that got stuck under the truck.

17

18  Q. And when she ran over the construction barrels what did she do?

19  A. She pulled over. And then a couple of citizens jumped out of their vehicle and pulled barrels out. And then she proceeded west on Elkhorn.

20  Q. And how far -- so she'd done a U-turn. She'd been going east, then she started coming west. How far did you follow her as she was going west on Elkhorn?

21

22  A. After the barrels, she started driving pretty straight. So, you know, I just told the 9-1-1 that, you know, I was done, I had to go home.

23  Q. So then you didn't follow her anymore?

24  A. No.

25

26                                        12

27

28

*Id.* at 16-19.

The next witness to testify was Michael Laythorpe, a police officer with the Las Vegas Metropolitan Police Department. *See id.* at 30-110. The court found Officer Laythorpe qualified as an expert with respect to drug recognition. *See id.* at 42. Officer Laythorpe testified that on February 13, 2009, following up on information he received on his police radio, he located Dimick in the parking lot at an animal hospital. *See id.* at 44-46. Officer Laythorpe then testified as follows:

> Q. Okay. And then that you saw the defendant exiting the animal hospital. Can you describe your observations of her?
>
> A. Yes, Sir. When she was walking out, she had a purse over her left shoulder, she had some keys in her right hands, she was walking a little unsteady. I approached her and asked her to stop and explained why I was making contact with her. And she questioned why I was stopping her. And then I looked at the front of her vehicle and I saw some damage to it.
>
> Q. What was the damage to the vehicle?
>
> A. Near the lower part of the right side of the vehicle there's a plastic skirt that runs across underneath the bumper -- it's to prevent debris from getting into the radiator or the fan -- it had some small scratches and -- and dents from some type of contact. It wasn't major damage, but it looked like the vehicle had struck something.
>
> \*   \*   \*
>
> Q. Did you observe anything unusual?
>
> A. Yes, Sir.
>
> Q. And what was it that you observed?
>
> A. Ah, I noticed ... her eyes to be having tremors or shaking. I noticed that she was unsteady on her gait while she walked. When I spoke to her I noticed that her speech was slurred. I noticed that her eyes appeared to be a little red or watery. And, as I was speaking to her, I didn't smell any alcohol. And also, when I was looking at her near the area where we were standing was shaded, it appeared that her pupils were constricted or very small.
>
> \*   \*   \*
>
> Q. In speaking to the defendant, did she make any admissions?
>
> A. Yes, Sir.

```
 1         Q.      And what were they?

 2         A.      She admitted that she was driving the car on Elkhorn.  She admitted
   that she had seizures.  She admitted that she takes prescription medication.  She told
 3 me what kind of medication it was, the dosage of the medication, and she told me
   how often she takes it.
 4
           Q.      And, based on your experience and training, did she appear
 5 intoxicated?

 6         A.      Yes, Sir.
```

*Id*. at 46-50. Officer Laythorpe testified that he administered the "Horizontal Gaze Nystagmus (HGN) Test" upon Dimick, and that test indicated that she was under the influence of a drug. *See id*. at 50-56; *see also id*. at 79, 105 (on cross-examination, Officer Laythorpe testified that this was not an indicator of impairment by a narcotic analgesic, such as hydrocodone). Officer Laythorpe testified that he next administered the "Lack of Convergence Test," and that test also indicated that Dimick was under the influence of a drug. *See id*. at 57-58; *see also id*. at 79-80, 105 (on cross-examination, Officer Laythorpe testified that this test, like the HGN Test, was not an indicator of hydrocodone impairment). Officer Laythorpe testified that he then administered the "Walk-and-Turn Test," and that test indicated that Dimick might be impaired. *See id*. at 58-59. Officer Laythorpe testified that he then administered the "Walk-and-One-Leg-Stand Test;" Dimick passed that test without any sign of impairment. *See id*. at 59-60. Officer Laythorpe testified that the final test that he administered was the "Finger-to-Nose Test," and that test indicated that Dimick might be impaired. *See id*. at 60-61. Officer Laythorpe testified that, based on the results of the tests he administered, he arrested Dimick. *See id*. at 61. Officer Laythorpe testified further:

```
           Q.      Prior to arresting her back in -- when you -- you said she admitted to
   you that [she had] taken prescribed medicine, did she indicate what the medicine
   was?

           A.      Yes, Sir.
```

Q. And what medication was it?

A. She was taking the pharmaceutical drug called Carisoprodol. It's known as a trademark of Soma, S-o-m-a. It is prescribed in three hundred and fifty milligram dosages four to six hours a day. And that is a muscle relaxer; it is also a CNS [central nervous system] depressant. It falls under the anxiety medication drugs for relief.

The second drug that she took was called Acetaminophen Hydrocodone. It's also commonly known as Lortab, L-o-r-t-a-b. And it's prescribed at that dosage to her as 10/500 milligrams and is also dosed four to six times a day, and it's in a pill cap -- caplet. That pill falls under a separate drug category called narcotic analgesic or pain reliever, and it's from a synthetic form of opium or [heroin].

Q. And do either of these drugs cause you to be impaired?

A. Yes, and specifically if they're taken together.

Q. And when you placed her under arrest, did you make a determination of any categories that you believed that she was under the influence of?

A. Yes.

Q. And what were those categories?

A. Central nervous system depressant, that was the Carisoprodol. And the narcotic analgesic, which was the Hydrocodone Acetaminophen.

\* \* \*

Q. Did you find any evidence that the defendant had those medicines?

A. Yes, Sir.

Q. And what was that evidence of the medicine?

A. That she had her purse with her that was required to be searched, before it was placed into a police vehicle and brought to a detention facility, for weapons. Upon looking into that purse, I located two prescription bottles that were in the name of [Dimick]. Those bottles were Carisoprodol and the Lortab, Hydrocodone Acetaminaphen. Those prescription bottles were dispensed or filled seven days before this incident....

\* \* \*

Q. Do medications or drugs have similar [effects] of impairment as alcohol-based beverages?

A. Yes, Sir. Carisoprodol or Soma, in the medical arena and in law

15

enforcement, is signified in training as an intoxicated person without the smell of alcohol. They have sluggish behavior. They have a problem with divided attention, multi-tasking problems, problems with memory, physical control, vision problems, dizziness, swaying. And these are also some of [the] side effects that were listed on that medication when I did follow-up with the medication pharmacy -- pharmacology.

    Q.    When -- you said it's the intoxicated person without the alcohol. Could it affect their driving?

    A.    Yes, Sir.

    Q.    If a person were to be driving on the wrong side of the road, would that be consistent with somebody intoxicated but with this medication?

    A.    Yes. Unless they had a reason to be on the wrong side of the road; if the road was designed for her to specifically drive on the wrong side of the road, or her vehicle had a mechanical problem that prevented her from driving on the correct side of the road.

    Q.    Would you expect somebody to be weaving across the road that was under the influence of these type[s] of medications?

    A.    Yes. And I [have specific] knowledge based on my experience and training of over fifteen hundred DUI's that a large number of those have included Lortab and Soma.

*Id*. at 61-64. Officer Laythorpe testified further:

    Q.    And, based on your experience and training as a drug recognition expert, was the defendant impaired in your opinion?

    A.    Yes, Sir. I believe she was impaired by a poly drug, which was a central nervous system depressant and a narcotic analgesic, which was the pain pills.

    Q.    And by taking different medications with separate side effects, will that cause impairment?

    A.    Yes, Sir.

*Id*. at 66. On re-direct examination, Officer Laythorpe testified as follows:

    Q.    Well, just first of all to clarify, was there two drugs involved --

    A.    Yes.

                   *    *    *

    Q.    Could you explain -- I think that Mr. Watkins [defense counsel] is

focusing on one. Could you explain the difference between the two and how they impact each other?

A. Correct. The difference between Lortab and Soma, people on Lortab, their pupils constrict or get small. People on Soma, their pupils enlarge or [dilate]. Between the two, you'd expect the pupils to be [dilated], small or normal, depending on how the effect of the drug is. People that take Soma, if they're impaired by the Soma will have HGN. People that take Lortab, if they're impaired by Lortab, generally will not have HGN.

Some of the symptoms are similar; they both have a lower blood pressure, a lower pulse rate, a lower body temperature. They're very similar type of drugs if they're taken separately. When you mix them together, they have combination effects.

So, if I saw a person that was taking a Soma pill and their pupils were very small, Soma doesn't make the pupils constrict. I would look toward the category of drugs, narcotic analgesics, that constricts the pupil. In this case, when I did my test, what had me believe there was a narcotic analgesic involved was the pupils appeared to be constricted or at the lower end of constriction.

The other stuff was similar to the Soma, the HGN. The exaggeration how the field sobriety tests were, how she behaved in the test, the way she took her steps, the way those things are measured, there was a combination of the two drugs....

\* \* \*

Q. Okay. And so the things -- all the circumstances, you testified that you came to this conclusion, what lead you to the conclusion that she was under the influence of Hydrocodone?

A. One, she had admission that she took Hydrocodone. Her pupils appeared to be constricted....

*Id*. at 96-97, 108 (emphasis added).

The evidence described above was sufficient to support Dimick's conviction. There was overwhelming evidence that Dimick was impaired. And, there was substantial evidence that she was under the influence of hydrocodone, and not just Soma: Officer Laythorpe testified that Dimick was in possession of hydrocodone when she was arrested; Officer Laythorpe testified that Dimick admitted that she took hydrocodone; and, Officer Laythorpe testified that, despite Dimick's use of Soma, which would otherwise be expected to enlarge her pupils, Dimick's pupils appeared

17

constricted -- on the smaller end of the normal range under the lighting conditions -- consistent with the effects of hydrocodone. Moreover, Officer Laythorpe, an expert with respect to drug recognition, testified that he was of the opinion that Dimick was under the influence of both hydrocodone and Soma. Viewed in the light most favorable to the prosecution, the evidence was such that the state courts reasonably ruled that a rational trier of fact could have found Dimick guilty of driving while impaired by hydrocodone. The Court will, therefore, deny Dimick habeas corpus relief on this claim.

**IV. Certificate of Appealability**

The standard for issuance of a certificate of appealability is governed by 28 U.S.C. § 2253(c). The Supreme Court has interpreted section 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir.2000).

Applying this standard, the court finds that a certificate of appealability is not warranted in this case.

**IT IS THEREFORE ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

/ / /

/ / /

18

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly and close this case.

DATED this 18th day of January, 2018.

_____
**RICHARD F. BOULWARE II**
**UNITED STATES DISTRICT JUDGE**